IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 18 CR 96 |
| ATTILA GYULAI, | ) | |
|     Defendant. | ) | Honorable Harry D. Leinenweber |

**DEFENDANT ATTILA GYUAI'S OBJECTION TO PRE-SENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

NOW COMES Defendant, ATTILA GYULAI, by and through his attorney, John T. Theis, and files the following sentencing memorandum in this cause:

**Background**

The Defendant Attila Gyulai is a 47-year old individual with no prior criminal history. This case arose out of a business dispute in the ownership and management of a once-popular and successful restaurant in Chicago. Defendant and others, including his wife, established the restaurant, Embeya, in the west Loop, in 2012 and it was well-reviewed and financially viable until internal disputes with co-owners caused it to decline.

Eventually, the business closed, and civil litigation among the parties commenced in the Circuit Court of Cook County. In early 2018, Defendant was charged with Wire Fraud, in violation of 18 U.S.C. Sec.1343, based on certain financial transactions that occurred in relation to the business. At the time the complaint was issued and a subsequent indictment was returned,

the restaurant had closed and Defendant Gyulai and his family were living outside the country. He was arrested in Spain on an extradition warrant, and was in custody on the warrant in Spain until he was brought to the Northern District of Illinois on or about May 31, 2019.

Defendant was released on an unsecured bond, with home incarceration, beginning June 4, 2019. He has been living with friends (and third-party custodians) since that time, as his wife Komal Patel and their three young children are living in Tulum, Mexico. Defendant is a naturalized United States citizen.

On November 7, 2019, Defendant pled guilty to Count Three of the indictment, with a plea declaration, but no plea agreement.

The Defendant respectfully requests that this Court sentence the Defendant consistent with the sentencing principles set forth in 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005). According to the Seventh Circuit, this Court must first calculate the advisory guideline range in this cause and resolve any disputed guideline issues, and then decide whether to impose a sentence within the advisory guideline range or outside the range by considering the factors set forth in 18 U.S.C. § 3553(a). *United States v. Robinson*, 435 F.3d 699 (7th Cir. 2006).

Section 3553(a) sets the standard for this Court. *United States v. Cunningham*, 429 F.3d 673 (7th Cir. 2005). Under that section and *Booker*, the Court "shall" impose a sentence consistent with the directive of 3553(a), that is a sentence "sufficient but not greater than necessary" to comply with the purposes of sentencing as articulated in the statute. Thus, this Court is required to sentence the Defendant to a sentence below the sentencing guideline, if that lesser sentence is sufficient to meet the requirements of 3553(a). It is the Defendant's position that a sentence authorized by the statute, but below the Guideline range would reflect the

seriousness of the offense, promote respect for the law, and provide just punishment for the offense. It would also afford adequate deterrence to criminal conduct and protect the public from future crimes, as well as provide the Defendant with the services listed in § 3553(a)(2)(D).

## Guideline Calculation

The probation office has concluded that the appropriate guideline calculation in this case places Defendant at an offense level 16 with a Criminal History category of I. Defendant disagrees with the calculation in the Pre-Sentence Investigation Report. Defendant has reviewed the USSG calculations and applicable law, and he agrees with the Probation Officer's assessment in all respects except the loss calculation (par.35, page 8) which the report assesses at $480,000, resulting in a 12-level enhancement. Defendant believes the loss is no greater than $40,000, which would result in a 4-level enhancement, or total offense level of 9 after adjustment for acceptance of responsibility. Defendant would be entitled to a three level reduction for acceptance of responsibility, but under Defendant's calculation he believes the two-level reduction applies, since the offense level should be 11 .

## Loss Calculation

The Pre-Sentence Report accepts the Government's version that the "loss amount" (including suggested relevant conduct) is $480,000. To reach such a conclusion, the Government has misinterpreted certain financial records of Defendant and the business in question. It has also included as a "loss" certain expenses of the business which were improperly included. It has also ignored other transactions which made it abundantly clear that much of what the Government calls fraud cannot even be considered fraudulent, much less a resultant "loss," as defined by the Guidelines.

A. The $140,000 Repayment

The Government's description of the financial set-up and the dealings with Ridgestone Bank is incomplete. The Government's reference to a "misappropriation of $140,000 in connection with the Class B shares" alleges that the Defendant and his wife obtained in effect a double payment of the return of their contribution to purchase the Class B shares.

The argument laid out in support of the Government's position ignores a significant additional financial piece. Ridgestone Bank, the lender, insisted on not only the collateral (supported by the Class B shares), but a separate $200,000 reserve, which was made up of additional, separate funds which Defendant raised. These funds, in the amount of $200,000, were provided to the bank and held for six months to make sure the business was sufficiently capitalized to be successful. The $200,000 came from the following sources:

      $70,000  from Jagmohan Jayara
      $30,000 from Hirad and Ravi Patel
      $40,000 from Ramesh Patel
      $20,000 from Greg Kocsis
      $40,000 from Anna and Gyorgy Gyulai

These funds were to be held by the bank for six months, from the date of April 20, 2012. This was referred to informally as the "reserve account" and was completely distinct from the $500,000 raised by the sale of the Class B shares. There is no question that this loan transaction was for the benefit of the business, and not for personal benefit of the Defendant. The bank made it clear that the construction and start-up funds would not be released without the additional reserve, and the business would not have gotten off the ground without the reserve funds required by the bank.

All of the individuals who provided funds for the reserve were repaid when the money became available after it was released by Ridgestone Bank. The Government will be unable to

introduce evidence at the sentencing hearing to support its theory that the Defendant improperly was repaid $140,000 and thus this amount should not be included in the loss calculation.

### B. The 50,000 Kocsis repayment

The Government's argument that the payments to Class B shareholder Greg Kocsis were improper is unsupported by the facts, but additional information is required to understand the timing of the payments to Mr. Kocsis. The defense has provided this information to the Government, and is prepared to support it at sentencing if necessary.

Greg Kocsis is an acquaintance of Defendant Gyulai and was an investor in the Embeya restaurant endeavor. He was also one of the lenders for the reserve account described above, but that is unrelated to this aspect of the Government's argument. When the money for the repayment of the equity investors became available, Defendant contacted Kocsis and informed him there was $50,000 available as partial payment. However, Defendant asked Kocsis if he would temporarily forego payment so that Defendant could use the money for another transaction, unrelated to the restaurant. Mr. Kocsis willingly agreed to do so. The first $50,000 was properly paid out of the business account, and Mr. Kocsis had the legal right to direct the use of the funds in any way he wished. He allowed Defendant to use the money for another purposes, and agreed to accept payment later.

Defendant made the $50,000 payment, as well as the other $50,000 Kocsis was owed, on August 17, 2015. The Bank records support that fact. The Government asserts that $150,000 of restaurant funds were paid out as Kocsis repayment, and that Defendant kept $50,000 for himself. That is not the case; $50,000 was paid out of the Our Sangha on June 6, 2014, and was not repaid to Kocsis until August 17, 2015. The second Kocsis payment occurred the same day, but was not paid out of company funds, but was from Defendant's account. Only

$100,000 for the Kocsis repayment came from the restaurant's funds

### C.  $190,000 in Our Sangha Funds

The Government next categorizes four separate transactions as "misappropriation of Our Sangha funds." The first is a withdrawal of "65,000 in March of 2014." This actually is in large part a repeat of the Kocsis transaction, above. The Defendant withdrew $50,000 from Our Sangha funds for repayment to Kocsis, but with Kocsis's permission did not actually pay the money to Kocsis until August of 2015. There is, of course, no "loss" to the company or the shareholders, who were required to repay investors. Kocsis had the right to agree to accept his equity repayment at a later date, which he did. This same $50,000 "loss" is duplicated by the Government in its loss calculation.

The remaining $15,000 of the $65,000 is in a different category.  Defendant does not recall the details of that part of the transaction, and is not challenging that finding in the PSR.

Defendant admits the transfers described in this section of the Government's submission, but it cannot  be characterized as a loss. The Government's evidence certainly supports the fact that for the last couple of years the restaurant was in business, the restaurant's financial success diminished. Defendant and his wife worked tirelessly to keep the business going, for themselves and for their employees. Defendant was the restaurant's manager and had the exclusive right to make management decisions. That included cutting payroll where necessary. The company employed two wine managers, Griffin Lawler and Michale Pickering, as well as a restaurant manager, David Lestok, and an office manager, James Stewart.

Lawler was being paid $2,500 per month as a wine manager from September to November, 2012. Pickering was paid $1,000 per month from May, 2014 to June, 2016. Defendant performed their duties for at least 24 months, which at the lower rate would involve

compensation of $24,000.

Lestok was paid $3,000 per month as restaurant manager, from September, 2012 to November, 2013. Defendant performed Mr. Lestok's tasks from November, 2013 to June, 2016. Even at a reduced rate of $2,000 per month, Defendant would have been paid $64,000 during the same period, but chose to forego that compensation. Stewart, the office manager, was paid $2650 per month from October, 2012 to October, 2015. Defendant's wife, Komal Patel, took over that function from October, 2015 to June, 2016. Even at a reduced rate of $2,250 per month, she would have been paid $18,000 for the same work.

These employees had to be let go, one by one, and they were not replaced. Instead, Defendant took on their duties, without compensation. The purpose, of course, was to keep the business going, in the hope that when it was successful he would financially benefit.

It is critical to note that these decisions were within Defendant's authority under the Operating Agreement. It was in the interest of the company that the business would become more successful, and Defendant was entitled to compensation for work which he (and his wife) performed. Thus, when the business closed, the funds left were not "profits" due to shareholders, but compensation which was due to the individuals who had been working day and night to keep the business alive. The money was paid from the payroll account. Under no legal theory can that be considered a loss under the Sentencing Guidelines.

Government's Loss Theory and Relevant Conduct

One further point regarding the Government's loss calculation: Implicit in the Government's argument on loss, if the defense reads it correctly, is that the "victims" of the loss are the shareholders of the company. If that is the case, the Government's loss calculation must

be adjusted to reflect the percentage of that figure to which Defendant and his wife, Komal Patel, were entitled as majority shareholders. Thus, even if the Probation officer, and ultimately the Court, determines there was a loss that involved money due shareholders, that amount must be reduced by 56.5% to reflect the value of the investment of Defendant and his wife.

Finally, the "relevant conduct" referred to by the Government is a loan made to Defendant by another individual, unrelated to the charges in the indictment. Defendant has repaid a substantial part of the loan, and still owes a balance. It does not meet the definition of relevant conduct, as it was a transaction was neither fraudulent nor related to the relevant business in any way. It was a loan which Defendant has repaid in part, and for which he is still obligated. No criminal penalty could attach for such a transaction.

## Section 3553(a) Factors

Section 3553(a) (1) requires the Court to consider the "nature and circumstances of the offense and the history and characteristics of the defendant."

The offense is serious, but Defendant's financial transactions, although at times fraudulent, were not motivated by greed as much as a desire to keep a once-successful business from failing. Business disputes often involve contentious disagreements among partners as to the value of individual efforts, and the compensation due for those efforts and contributions. That said, Defendant understands it is never acceptable to "rob Peter to pay Paul" even if the goal in the first instance is to keep the business afloat. He recognizes the criminality of his conduct and accepts sole responsibility for it.

The mitigation side of the ledger, however, is compelling. The Pre-Sentence Investigation Report fairly and accurately describes Defendant's adult life and shows a long history of hard work and no prior contact with law enforcement.

This part of the 3553(a) (1) calculation relates to the "history and characteristics of the defendant." No one 3553(a) factor should be viewed without viewing the sentencing statutes as a whole, but Defendant's personal history suggests very strongly that a sentence within the Guidelines would be "greater than necessary" to meet the strictures of 3553(a).

The PSR reveals that the Defendant is an individual for whom the criminal conduct alleged, and admitted to, is an aberration in an otherwise law-abiding life marked by responsible behavior. Defendant is a criminal history category I offender. He is embarrassed by his actions, and has acted since the period of time covered by this offense in a way which should give this Court hope that recidivism is unlikely. There are other matters for this Court to consider when seeking to determine an appropriate sentence in this case: First, it is undeniable that Defendant and his family left Chicago and this country prior to any charges being brought in this case. They travelled to Toronto, Canada, and to Hungary to be of assistance to two family members in those locations. Sadly, both of these parents, Defendant's father and his father-in-law, died within days of each other in 2016. Prior to their death, Defendant and his wife were close to both and sought to assist in their care. During this same period, Defendant's daughter, Serena was diagnosed with the heart and breathing issues described in the PSR. The family's travel to Tulum, Mexico, where Defendant's wife and their three children remain, was for her care.

This leads to another consideration. Defendant has been separated from his wife and young children for over a year, unable to provide for them, and communicating by video conferencing every day. This separation is a severe penalty to pay for his conduct in this case.

Third, Defendant was arrested on an extradition warrant in this case in Spain on December 26, 2018, and remained in custody in Spain until at least May 31, 2019, when he was turned over, in custody, to United States authorities. He remained in custody at the Metropolitan

Correctional Center in Chicago until his was released to home incarceration, within location monitoring, at the home of a couple who were friends. Defendant has served his pre-trial period without any violation.

Finally, Defendant's conduct has had other financial consequences. His family lost their home in Chicago, and his business partners have obtained substantial civil judgments against him in the Circuit Court of Cook County.

Because of the totality of these extraordinary circumstances, and the other mitigating factors described above, Defendant seeks a sentence of time considered served, with whatever restitution order the law requires. Defendant also wishes to be reunited with his family, so if this Court feels a period of supervised release is necessary, Defendant wishes to be allowed to travel to Mexico to join them as a family after a long separation.

## CONCLUSION

The Defendant respectfully requests that this Court sentence him to a period of incarceration consistent with the United States Sentencing Guidelines and 18 USC Sec. 3553(a), which Defendant submits would be a period of time considered served.

February 11, 2020

                                          __/S/ John T.Theis_____
                                          JOHN T. THEIS

                                          Attorney for Defendant Attila Gyulai

Attorney for Defendant
190 South LaSalle Street, Suite 520

Chicago, Illinois 60603
312-782-1121
theislaw@aol.com

## CERTIFICATE OF SERVICE

     I hereby certify that on January 13, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/EDF system which will send notification of such filing to the CM/ECF participants.

                                        s/John T.Theis
                                        JOHN T.THEIS
                                        190 South LaSalle Street
                                        Suite 520
                                        Chicago,IL 60603
`       `                             Phone (312) 782-1121
                                        Fax (312) 422-1121
                                        Theislaw@aol.com